MANSMANN, Circuit Judge,
dissenting, with whom Judges SLOVITER, NYGAARD and McKEE join.
I.
Today the majority interprets and applies the “three strikes” rule of the Prison Litigation Reform Act of 1995 (“PLRA”), 28 U.S.C. § 1915(g), in a manner destined to bar the doors of our courts against a disfavored group — indigent prisoners who have resorted unsuccessfully to civil litigation — even with respect to meritorious litigation that may be their sole means of vindicating a fundamental right. Because I believe that this case falls within a statutory exception, as properly interpreted in Gibbs,[1] and that the statute, as interpreted and applied by the majority, substantially burdens fundamental rights without narrowly serving a compelling governmental interest, I respectfully dissent.
In 1990 we struck down a District Court injunction barring in forma pauperis (“IFP”) suits by the same Appellant before us today as violative of the constitutional right of access to the courts, and we directed instead entry of an injunction that would permit such suits subject to certification and review calculated to test for frivolity. See Abdul-Akbar v. Watson, 901 F.2d 329 (3d Cir.1990). While not expressly repudiating our holding in Watson, the majority nonetheless essentially holds that what the District Court was then precluded from doing by the Constitution it is now *320 required to do by statute. Today’s holding therefore places us at odds with a well-established line of cases exemplified by Watson.[2]
This case unfortunately illustrates the maxim that bad cases may sometimes make bad law. This Appellant has clearly abused the IFP system, filing some 200 cases, most without merit. The three strikes rule as interpreted by the majority, however, will burden other would-be litigants who have not filed 200 eases, and whose “strikes” were racked up without any bad faith or abuse.[3] It will, moreover, bar potentially meritorious litigation at the filing stage, with no opportunity for substantive review or appeal.
II.
The principal holding announced by the majority is not very far-reaching. It rejects a statement in our earlier Gibbs case to-the effect that imminent danger is to be determined as of the time of the incident complained of, and joins with our sister courts of appeals that have held that danger must exist at the time the Complaint or appeal is filed. I joined in, and continue to adhere to, the able opinion of Judge Garth in Gibbs. In Gibbs we held that a prisoner who alleged two prior attacks by inmates and death threats, each related to his identification as a government informant, and who alleged that his “life[was] in constant danger”, provided sufficient allegations of “imminent danger” to survive the “three strikes” rule. Although our principal holding was that “a complaint alleging imminent danger ... must be credited as having satisfied the threshold criterion of § 1915(g) unless[that] element is challenged”, we also stated that “the proper focus when examining an inmate’s complaint filed pursuant to § 1915(g) must be the imminent danger faced by the inmate at the time of the alleged incident, and not at the time the complaint was filed.” 116 F.3d at 86.
No clear intent may be discerned from section 1915(g)’s use of the present tense (“unless the prisoner is under imminent danger”), because the same subsection elsewhere employs the present tense in reference to what are expressly recognized as past events (“if the prisoner has brought an action or appeal ... that was dismissed on the grounds that it is frivolous, malicious or fails to state a claim ...”). This erroneous combination of tenses renders the statutory provision ambiguous, and I believe that such ambiguity must be resolved in favor of preserving the right of access to the courts for prisoners threatened with bodily injury.
*321 As the majority has acknowledged, the purpose of the exception is to “prevent[ ] future harms.” Supra at 314. This purpose is best served by a liberal interpretation of the exception, one which gives scope to — and so facilitates — the deterrent effect of the subsequent damages remedy available under section 1983. See City of Riverside v. Rivera, 477 U.S. 561, 575, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (plurality) (stating that “the damages a plaintiff recovers contribute significantly to the deterrence of civil rights violations in the future”). Cf. Gibbs (rejecting argument that “suit for damages rather than injunc-tive relief ... was not seeking to protect ... physical safety”). 116 F.3d at 85. Contrary to the majority’s assertion, the exception as interpreted by Gibbs does not “eviscerate” the three strikes rule. A would-be litigant must plead imminent danger of serious physical injury (rather than a deprivation of procedural, associational, religious or other rights), and the court must determine that such danger is or was in fact present if such allegation is controverted. Moreover, as discussed below, section 1915(g)’s potential encroachment into important constitutional rights also counsels for a broad interpretation of the exception. Finally, the importance of presenting an appropriately lenient interpretation in this en banc opinion — -which will guide the district courts in their decisions on hundreds, if not thousands, of prisoner filings — is heightened by the pre-clusive nature of section 1915(g). That is, the denial of in forma pauperis status and resultant dismissal of prisoner litigation made pursuant thereto will be effectively unreviewable, as a truly indigent plaintiff will no more be able to afford the requisite filing costs for appeal of that dismissal than for the underlying action.
III.
While I disagree with the majority’s rejection of the standard enunciated in Gibbs for one which determines the existence of imminent danger at the time the Complaint or appeal is filed, it is the majority’s application of that standard to the facts of this case, and implicitly to those of Gibbs, that I find considerably more troubling.
The majority appears simply to assume that its holding that imminent danger must be assessed at the time of filing is dispositive of this case, and that Appellant was not in such danger. In so assuming, the majority seriously undermines protection of physically endangered prisoners by paying too little heed to ongoing threats.
The majority’s lengthy explication of statutory tense notwithstanding, an equally crucial question of interpretation under section 1915(g) concerns the meaning of “imminent danger”. The majority’s definition of “imminent” dangers as those “which are about to occur at any moment or impending”, supra at 314, is far too restrictive. In a real-world prison setting, the timing of an attack cannot be so neatly predicted. It may be that an ongoing threat of danger looms over a prisoner for an extended period. At any given moment, the harm might not be “about to” occur; then again, it might. Such is the nature of “danger”. It involves risk, not certainty.
The phrase “imminent danger” is not defined in the PLRA. It may be instructive, however, to consider the definition accorded the same phrase in other contexts. For example, under the Eighth Amendment prison authorities must protect prisoners not only from current threats, but also from “sufficiently imminent dangers”; the courts have defined that phrase as encompassing those dangers “likely to cause harm in the ‘next week, month, or year.’ ” Horton v. Cockrell, 70 F.3d 397, 401 (5th Cir.1995) (quoting Helling v. McKinney, 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); Payne v. Collins, 986 F.Supp. 1036, 1052 (E.D.Tex.1997) (observing that this approach includes review of the actions taken to alleviate the threat)).[4] In discussing *322 “imminent harm” in the preliminary injunction context, we have held that standard met where the potential harm was not “uncertain or speculative”, but might be expected to occur before the threat could otherwise be averted.[5] In determining standing, the courts have framed their inquiry into the “immediate threat” as one encompassing consideration of the likelihood of an ongoing danger, as evidenced by past events. See, e.g., O’Shea v. Littleton, 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (“past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury”).
Indeed, this conception of imminent danger as encompassing an ongoing threat has been explicitly recognized by one of our sister circuits. In Ashley v. Dilworth, 147 F.3d 715 (8th Cir.1998), the Eighth Circuit held that a prisoner placed in continuing proximity to inmates on his “enemy alert list” and subject to prior assaults “properly alleged an ongoing danger” and so “[met] the imminent danger exception of section 1915(g).” 147 F.3d at 717.[6]
Appellant’s litigious history may incline us to read his Complaint with a certain degree of skepticism. Nonetheless, our precedents require us to construe pleadings, and especially pro se pleadings, liberally. See Gibbs, 116 F.3d at 86 (observing that “[u]nder our liberal pleading rules” all allegations should be construed “in favor of the complainant”) (citations omitted). Reading the Complaint in the light most favorable to Appellant, I find his claimed predicament alarming.
Appellant, a black inmate, brought this action seeking, inter alia, an injunction against white prison guards “from continuing ... plots to hurt or kill [him]”. App. 8. The guards in question are asserted to be racists who “don’t accept ... Black people as human beings” and thus do not respect rights of any black person. App. 13. Appellant is a particular target of the guards’ animus, as he asserts they are engaged in a conspiracy to retaliate against Appellant for filing complaints against them for past abuses. App. 9.
Guards have made a practice of using pepper gas routinely to punish inmates for failing to obey orders or for “saying something an officer don’t like.” App. 10. “[M]a-jor problems happen on the white [guards’] shifts, especially Black inmate’s [sic] getting sprayed arbitrarily with pepper gas.” App. 13. Although Appellant complained for over a year about the abuse of pepper gas, no restraint was placed on the use of pepper gas. App. 10,11.
Defendants “know [Appellant has] asthma ... and they’ve seen [him] suffer whenever that pepper gas has been sprayed.” App. 12. The danger faced by Appellant was not limited to attacks directed against him. Rather, the use of pepper gas “effects [sic] every inmate ... in the area”. For example, in December, 1997, Appellant was exposed to pepper gas directed at other inmates and was taken to the hospital with an asthma attack. App. 10-11.
*323 In September or October of 1997, in a “deliberate attempt to have [Appellant] hurt or killed”, a guard told an inmate that Appellant had “snitched” on him and other inmates. App. 12. Although Appellant feared for his life as a result of this incident, his request for protective custody was not honored. App. 12.
On January 8,1998 Appellant was transferred to a cell block with no window “for the express purpose’s [sic] of having [him] in an area where the [racist guards] could harass, set up and try to kill [him]”. The very next day, one of the defendant guards, again in the presence of other inmates, accused Appellant of informing, and proceeded to spray him with an entire can of pepper gas, whereupon Appellant collapsed with an asthma attack, “fighting for breath on the floor” and the guard “left [him] on the floor to die.”
As far as the record reflects, none of the foregoing conditions had been corrected at the time Appellant filed his Complaint.[7]
In sum, Appellant alleges that at the time of the Complaint (i) Appellant remained confined in an institution controlled by guards who believed he did not have any rights and who had a vendetta against him; (ii) the guards made a practice of spraying inmates with pepper gas (to which Appellant was acutely vulnerable) on slight provocation, and prison officials placed no restraint on that practice; (iii) Appellant had been injured twice by pepper gas within just the past 10 weeks prior to filing;[8] (iv) the guards had incited hostility toward Appellant on the part of other prisoners by labeling Appellant as an informant; [9] and (v) Appellant was housed in a cell block selected to facilitate attacks by guards and inmates. These unabated conditions clearly give rise to an ongoing imminent danger.
Hence, I believe the facts alleged in this case place Appellant squarely within a proper interpretation of the exception to the three strikes rule. In Gibbs, as in Ashley and Choyce, there were similarly sufficient averments of ongoing danger that remained “imminent” at the time of filing.[10] The majority today disposes of this case, overrules Gibbs, and effectively disagrees with Ashley and Choyce, without carefully analyzing the sufficiency of the allegations of ongoing danger.[11]
*324 The result is that, henceforth in this Circuit, prisoners with three strikes seeking IFP status will be faced with an insurmountable obstacle: they must show that a serious physical injury is “about to” befall them “at any moment”, and apparently they may not predicate their showing on an ongoing risk based on past events.[12] What, then, will suffice? Must a prisoner be running from his attackers as he files? By limiting the imminent danger exception to the “sword of Damocles” situation, the majority all but writes the exception out of the statute. Certainly, the drastically impoverished version of the exception allowed by the majority cannot well fulfill its putative office as “a safety valve ... to prevent impending harms”. Supra at 315.[13]
A prisoner’s resort to the courts may be expected to avert impending danger not only by correcting unlawful conditions,[14] but by deterring prison officials from unlawful conduct. Under the majority’s interpretation, the potential deterrence of civil rights damages would be lost with respect to indigent prisoners with a history of prior failed suits. That is, guards would be free to abuse or retaliate against such prisoners without fear of civil liability, so long as their conduct was not so perpetual as to trigger the majority’s test for imminent danger.
The majority’s undermining of the protections afforded civil rights under section 1988 is exacerbated by other factors which, by delaying access to courts, increase the likelihood that past abuses will effectively be immunized because a danger will no longer be “imminent” at the time of filing.[15]
*325 Finally, even in the rare case that satisfies the majority’s narrow definition of imminent danger at the time of filing, a prisoner is effectively denied protection against trial error. Under the majority’s interpretation, a prisoner who has secured a final judgment in the District Court finds himself in a peculiar position: he must once again meet the “imminent danger” requirement at that moment in time in order to file an appeal IFP. It is highly improbable that the danger would still be “about to” occur at the time of an appeal, following entry of judgment.
Although the majority opinion purports to create unanimity among the courts of appeals, it does not and cannot achieve that purpose. As discussed above, today’s holding cannot be reconciled with either the Eighth Circuit’s decision in Ashley or the Fifth Circuit’s decision in Choyce. Those cases evaluated the danger as of the filing date, but both recognized that the imminent danger requirement may be satisfied by an ongoing threat evidenced by past injuries attributable to uncorrected conditions. See supra n. 6 and accompanying text.[16] We cannot avoid a conflict by reciting similar standards, while reaching inconsistent results.
I would hold that the exception applies, in accord with Gibbs, Ashley and Choyce; and I would leave for another day determination of the constitutional validity of section 1915(g) in a case that clearly falls outside of its saving exception.[17] However, since the majority has interpreted the exception narrowly and has found this case within the rule barring IFP status, I will proceed to address the statute’s constitutionality.
IV.
As the majority acknowledges, “[s]tat-utes that substantially burden a fundamental right ... must be narrowly tailored to serve a compelling governmental interest. Plyler v. Doe, 457 U.S. 202, 216-17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).” Supra at 316.[18] The right of access to the courts has long been deemed fundamental. As long ago as 1215, this right was articulated in Chapter 29 of the Magna Carta.[19] In the *326 seminal case of Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803) the Supreme Court observed that “[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.” More recently, the Court has repeatedly recognized the fundamental importance of the right of access to courts.[20]
In Wolff, supra, the Supreme Court held that prisoners have a constitutional right to bring civil rights actions before the courts. “The right of access to the courts ... is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights.” Wolff, 418 U.S. at 579, 94 S.Ct. 2963.[21]
By 1977, the Supreme Court found it to be “beyond doubt that prisoners have a constitutional right of access to the courts.” Bounds v. Smith, 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).[22] The Court in Bounds described this right of access as “fundamental”, and held that it requires that prisoners receive “a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.” Bounds, 430 U.S. at 825, 828, 97 S.Ct. 1491. Finally, in Lewis, the Court indicated that inmates’ right of court access recognized in Bounds applies to actions “to challenge the conditions of their confinement”. Lewis, 518 U.S. at 355, 116 S.Ct. 2174.
As we have previously held, this right of court access applies even to litigious prisoners such as Appellant. See In re Oliver, 682 F.2d 443, 446 (3d Cir.1982), quoted in Watson, 901 F.2d at 332 (“Access to the courts is a fundamental tenet to our judicial system; legitimate claims should receive a full and fair hearing no matter how litigious the plaintiff may be.”).
In view of this long and virtually unbroken array of authority,[23] it can scarcely be disputed that prisoners’ right of access to the courts is a fundamental right. The majority is doubtless correct in pointing out that the right of access is “not absolute”; no rights are. What is important for equal protection purposes is that the right of access is fundamental, at least when underlying fundamental rights are in *327 volved. See McCarthy v. Madigan, 503 U.S. 140, 153, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (“[T]he right to file a court action might be said to be [a prisoner’s] remaining ‘most fundamental political right, because preservative of all rights.’ ”) (quoting Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)).[24] Even if access to courts were not itself a fundamental right, denial of access should still be subject to strict scrutiny to the extent that it may impermissibly burden underlying fundamental rights at stake.[25]
Indeed, the majority opinion acknowledges that “[a]n unconditional right of access exists for civil cases ... when denial of a judicial forum would implicate a fundamental human interest”. Supra at 317. However, it declines to address whether Appellant’s claims involve fundamental rights.[26]
Notwithstanding the majority’s avoidance of the issue, it is manifest that the rights underlying Appellant’s suit are fundamental. As I read the Complaint, at stake are the rights to be free from arbitrary infliction of serious physical injury,[27] and from racially discriminatory assault.[28] That these rights are fundamental to our constitutional system cannot be gainsaid.[29]
*328 Moreover, other fundamental rights are sure to be implicated in cases barred by the three strikes rule. For example, a suit charging denial of a prisoner’s religious freedom in violation of the First Amendment is not likely to involve an element of imminent danger, and so will fall outside of the exception under section 1915(g). See, e.g., Lyon v. Krol, 940 F.Supp. 1433, 1437 (S.D.Iowa 1996), appeal dismissed, 127 F.3d 763 (8th Cir.1997) (dismissing prisoner’s free exercise of religion claim pursuant to three strikes rule). Cf. O’Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (recognizing prisoner’s fundamental right to free exercise of religion).[30]
It seems clear that section 1915(g) substantially burdens affected prisoners’ access to the courts and thereby burdens their enjoyment of whatever underlying rights they may seek to enforce in court. The statute’s effect, in contravention of our law going back to the Magna Carta, is either to sell, to delay or to deny justice to the prisoners subject to its strictures.[31] If they cannot buy entry into court, they must wait until they can; and if the wait is too long, justice will be denied to them.[32]
In response to the apparent burden on fundamental rights, the majority makes two arguments: First, the majority argues that section 1915(g) does not prevent affected prisoners from filing their actions, but only from enjoying IFP status. The same argument was previously made by the Eleventh Circuit. See Rivera v. Allin, 144 F.3d 719, 723 (11th Cir.1998). This argument reflects a surprising disregard for the practical financial constraints faced by indigent prisoners, and appears to ignore the reality, recognized by the Supreme Court, that even a small prepayment obligation can pose an insurmountable hurdle. See Boddie, 401 U.S. at 380, 91 S.Ct. 780 (acknowledging that a facially valid fee may “offend due process because it operates to foreclose a particular party’s opportunity to be heard.”); Green, 669 F.2d at 786 (describing a prepayment requirement as a “potentially prohibitive financial barrier” to court access on the part of the affected indigent prisoner). The majority does not, however, really miss this point: in the very same paragraph in which it argues that section 1915(g) does not block access to the federal courts, it concludes that precluding suit in federal court as a practical matter is precisely what Congress intended. See supra at 314-15.[33]
Because it ultimately recognizes the practical reality that access to the federal courts will be delayed or denied for some, the majority repairs to its second argument: that foreclosing the federal forum *329 imposes no real burden, as prisoners may bring the same civil rights claims in state courts, “where limitations on filing I.F.P. may not be as strict.” Supra at 314 (emphasis added); see also supra at 317. In the end, the majority’s rejection of strict scrutiny is expressly predicated on the presumed availability of a state law forum.[34] See supra at 318 (“Because neither Delaware substantive law nor Delaware court rules prevented [Appellant] ... from pursuing his claims, we do not agree that strict scrutiny is the appropriate test.”) (emphasis added).[35] See also Wilson v. Yaklich, 148 F.3d 596, 605 (6th Cir.1998) (concluding that prisoner’s fundamental right of access to the courts was not infringed upon because he “still had available ... the opportunity to litigate his federal constitutional causes of action in forma pauperis in state court.”). But cf. Rivera, 144 F.3d at 724 n. 9 (declining to place reliance on availability of state forum).
Even assuming that a state forum is available, however, it is by no means clear that denial of a federal forum does not in itself impose a substantial burden on the right of access. See, e.g., Lyon, 940 F.Supp. at 1437-38 (“Although inmates can also bring S 1983 claims in state court, plaintiffs have an important interest in access to federal courts for vindication of their federal constitutional rights.”); see also Procup, 792 F.2d at 1070 (“An absolute bar against a prisoner filing any suit in federal court would be patently unconstitutional.”); Green, 669 F.2d at 786 (concluding that “constitutional right of access to the courts” was “unduly impair[ed]” by order that effectively denied “any and all access to the district court”); Packer Avenue Assocs., 884 F.2d at 748 (holding that order prohibiting subsequent filings in federal court could “not be allowed to stand”).[36]
Although the alternative forum argument may have superficial appeal, I do not believe it can withstand searching examination. In the first place, the argument neglects to consider foreclosure of the courts to the “three-strikes” prisoner in states which have adopted parallel legislation.[37] This is not merely an academic con- *330 eern. The Commonwealth of Pennsylvania appeared as an amicus curiae in this case and explained that the “many thousands of prisoners” housed in Pennsylvania’s thirty-nine correctional facilities “annually file hundreds of federal civil actions directed against state officials and employees”, and implied that a substantial number of those actions would be affected by the decision announced herein. Because Pennsylvania has adopted a three strikes limitation of IFP status that parallels section 1915(g), there is no judicial forum available to indigent Pennsylvania prisoners with three strikes unless they can satisfy the majority’s virtually preclusive test for imminent danger, no matter how meritorious their claims and no matter how fundamental the rights at stake.[38]
In the second place, the alternative forum argument also neglects the potential implications of removal to federal court. Federal-law civil rights actions filed in state court generally may be removed by the defendants, with the likely effect that an indigent plaintiff subject to the three strikes rule would lose his ability to appeal.[39] The prospective loss of such an important procedural safeguard is a very substantial burden on affected litigants.[40]
Because section 1915(g) does impose a substantial burden on the fundamental rights of many if not all members of the class against whom it is directed, the next step is to examine whether it is narrowly tailored to serve a compelling governmental interest.
As identified by the majority, the congressional purpose behind section 1915(g) was to deter frivolous lawsuits through “economic incentives that would prompt prisoners to ‘stop and think’ before filing a complaint.” Supra at 318. See also supra at 314 (“The ‘three strikes’ rule ... supplied a powerful economic incentive not to file frivolous lawsuits or appeals.”).[41] It is not at all apparent how “disqualifying frequent filers who have failed in the past to carefully evaluate their claims” can serve as a “deterrent mechanism”. Supra at 318 (emphasis added). No matter how long a disqualified prisoner such as Appellant stops, no matter how carefully he thinks, and no matter how meritorious his claims, he will remain disqualified. It is simply not possible to deter frivolous filings that have already occurred. At a minimum, *331 therefore, the retrospective application of the three strikes rule to past filings cannot further the statute’s asserted deterrent purpose.[42]
With respect to future filings, it is difficult to see how the three strikes rule functions solely as an economic deterrent. To be sure, another section of the PLRA is well calculated to have that effect. See 28 U.S.C. § 1915(b) (requiring prisoners with IFP suits to pay filing fee in installments, in lieu of prior practice of waiving fee). This section corrects the perceived problem of inmates filing suits with no financial consequences, while at the same time ensuring that the truly indigent prisoner will not be denied access to the courts solely because he lacks the requisite funds.[43] The disincentive supplied by the three strikes rule, on the other hand, is not purely economic. For the truly indigent, the rule threatens a loss of the fundamental right of access to the courts. This is in no sense a market-correcting economic deterrent.[44]
In any event, even assuming that the goal of deterring frivolous suits is a compelling governmental interest, and that the three strikes rule somehow furthers that goal, the statute nevertheless cannot withstand strict scrutiny because at best there is only a very poor fit between end and means. As a mechanism for deterring frivolous claims, section 1915(g) is both under- and over- inclusive. On the one hand, it leaves unchecked the flow of frivolous lawsuits filed 'by indigent non-prisoners and by prisoners and non-prisoners with sufficient funds.[45] On the other hand, it cuts off non-frivolous claims filed by indigent prisoners within its scope. See supra, at 314 (“In stark terms, ... the I.F.P. privilege will not be available ... no matter how meritorious subsequent claims may be.”).[46] These shortcomings precisely echo those of the prepayment requirements disapproved in Green and its progeny.[47] Cf. Rinaldi v. Yeager, 384 U.S. 305, 310, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966) (state statute requiring reimbursement of cost of criminal appeal transcript only as to prisoners held unconstitutional: “Assuming a law enacted to [deter frivolous appeals] to be otherwise valid, the present statutory *332 classification is no less vulnerable under the Equal Protection Clause when viewed in relation to that function. By imposing a financial obligation only upon inmates of institutions, the statute inevitably burdens many whose appeals, though unsuccessful, were not frivolous, and leaves untouched many whose appeals may have been frivolous indeed”) Moreover, much better targeted means are available to arrest chronic frivolous filings.[48]
It is therefore not surprising that courts which have applied strict scrutiny have found section 1915(g) wanting. See Lyon, 940 F.Supp. 1433 (S 1983 action alleging denial of participation in Jewish services and other religious practices); [49] Ayers v. Norris, 43 F.Supp.2d 1039 (E.D.Ark.1999). See also Wilson, 148 F.3d at 604 (upholding section 1915(g) under a rational basis test, but noting the court “might not believe [S 1915(g)] to be ... even a prudent[ ] response to the problem presented”).[50]
Because section 1915(g) is not narrowly tailored to serve a compelling governmental purpose, its substantial infringement of indigent prisoners’ fundamental right of access to the courts, and of the constitutional rights at stake in the potential litigation thwarted thereby, amounts to an unconstitutional deprivation of the equal protection of the laws and of the due process of law guaranteed by the Fifth Amendment.[51] Cf. Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (“A law declaring that in general it shall be more difficult for one group of *333 citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense.”)-[52]

. Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997).

. In both Watson and our prior decision in In re Packer Avenue Associates, 884 F.2d 745 (3d Cir.1989), we adopted the approach of the District of Columbia Circuit in the leading case of In re Green, 669 F.2d 779 (D.C.Cir.1981). See also Procup v. Strickland, 792 F.2d 1069, 1072 n. 6 (11th Cir.1986) (en banc) ("Several courts have held that a total ban on all IFP filings by a particular litigant as a sanction for abuse is impermissible.”) (citing Green and cases from Second, Ninth and Tenth Circuits); Joseph T. Lukens, The Prison Litigation Reform Act: Three Strikes and You're Out of Court — It May Be-Effective, But Is It Constitutional?, 70 Temp. L.Rev. 471, n. 90-91 (Summer 1997) (providing extensive citations to circuit court cases requiring that injunctions be narrowly tailored to preserve access for legitimate claims). The sole difference between the preclusive effect of injunctions held impermissible in the cited cases and the statutory bar of section 1915(g) is that the latter includes a narrow exception (extremely narrow, as interpreted by the majority) which is patently insufficient to safeguard the broad scope of rights jeopardized by the IFP ban. Cf. Procup, 792 F.2d at 1074 (Clark, J., concurring) (construing limitation of IFP for abusive prisoner litigant to "claims alleging actual or threatened physical harm” to be "an unconstitutional denial of access”).

. Although dismissals for failure to state a claim do not necessarily signify abuse, they nonetheless count as "strikes” for purposes of section 1915(g). Moreover, the many procedural and substantive hurdles erected in the path of civil rights claims against government actors might easily trip up a pro se litigant with a bona fide claim. The majority’s repeated characterization of the statutory bar as applying only to prisoners who "abuse” the judicial system by filing frivolous actions is therefore somewhat misleading.

. See also, e.g., Maze v. Hargett, 1998 WL 378369 *3 (Apr. 27, 1998 N.D.Miss.) (finding *322 "sufficiently imminent danger of future physical harm” during prisoner’s "tenure” in light of continuing conditions).

. BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp., 229 F.3d 254, 263 (3d Cir.2000) (citing 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure § 2948.1 at 139 (2d ed.1995) as "explaining that imminence requires that the harm will occur before a trial on the merits can be had”). Another statute similarly "defines the threat of 'imminent danger’ as the existence of a condition ... which could ‘[reasonably be expected to cause substantial harm ... before such condition ... can be abated.’ ” Hodel v. Va. Surface Mining & Reclamation Assn., 452 U.S. 264, 301, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), quoting the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1291(8) (1976 ed., Supp. III).

. See also Choyce v. Dominguez, 160 F.3d 1068 (5th Cir.1998) (remanding for reconsideration of imminent danger determination where prisoner alleged incident complained of "was only one episode in an ongoing pattern of threats and violence” in retaliation for prior litigation).

. Although many of the foregoing allegations may strike the reader as improbable, they are as yet uncontroverted, and I believe that we are required to accept them as true for present purposes. Cf. Gibbs, 116 F.3d at 86 (holding that a district court should accept the allegations in the Complaint in determining imminent danger for IFP purposes, pending the appearance of a defendant who may controvert the allegations).

. Cf. Ashley, 147 F.3d at 717 (concluding imminent danger exception met in part because ‘complaint was filed very shortly [within one month] after the last attack”); Choyce, 160 F.3d at 1071 n. 4 (suggesting reconsideration in light of erroneous view that 17 months had passed since last injury, where actually complaint was filed in 40 days).

. Cf. Wolff v. McDonnell, 418 U.S. 539, 562, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("Relationships among the inmates are ... perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner. .... The reality is that disciplinary hearings ... necessarily involve confrontations ... between inmates who are being disciplined and those who would charge or furnish evidence against them. Retaliation is much more than a theoretical possibility....").

. See Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997) (inmates’ awareness of prisoner's status as informer subjected him to threats and attacks; Gibbs claimed his “life [was] in constant danger” and conditions were unaddressed until litigation filed; prisoner was transferred during pendency of appeal); see also supra n. 6 and accompanying text (discussing Ashley and Choyce).

. The majority neglects duly to consider the actual averments of Appellant’s complaint, instead observing that “at no point in the present litigation did Appellant seek to rely on an ongoing danger theory”. Supra at 315 n. 1. To the contrary, Appellant's counsel stated at oral argument that “if you look to the complaint itself, ... he alleges a continuing course of conduct.” Moreover, Appellant’s counsel expressly "embrace[d]" the argument that the time at which imminent danger is assessed is not controlling, because "imminent really doesn’t mean impending.”
*324 In any event, the majority opines as to the sufficiency of allegations of ongoing harm, and in doing so applies too exacting a standard. Turning briefly to the complaint, the majority expresses "doubt whether [it] suffice[s] to establish such an ongoing danger.” Supra at 315 n. 1. Of course, under our liberal pleading rules such a doubt should be resolved for, rather than against, Appellant. Similarly, the majority’s observation that some of Appellant’s allegations are "generalized” should not control our reading of the complaint. Even if those general allegations were not supported with specific facts, as they are here, a pleading should be deemed sufficient if it provides reasonable notice of the theories presented. See Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). This lenity in pleading review is especially important as applied to an indigent, incarcerated, pro se litigant whose access to the courts is narrowly circumscribed.
The majority concludes that Appellant’s allegations fall short because the several acts of which he complains are "unconnected”, and do not form a “pattern”. Supra at 315 n. 1. A fair reading of the complaint indicates, however, that the events are connected by two alleged ongoing factors: a long-established practice of arbitrary use of pepper gas against black inmates, and a specific animus on the part- of the guards against Appellant. Moreover, in suggesting that the mere passage of time between the incidents and after the last incident means that the danger was no longer imminent at the time of filing, the majority disregards the continuing, unremedied nature of the factors that allegedly caused the incidents. Indeed, the occurrence of multiple incidents over a substantial time period supports rather than under mines the conclusion that Appellant's danger was ongoing.

. Cf. O’Shea, supra.

. The majority's narrow reading of the exception will have a far-reaching effect, as persistent, ongoing imminent danger is a condition all too often encountered in our nation’s prisons. Cf. Wolff, 418 U.S. at 562, 94 S.Ct. 2963 (In many prisons, "[g]uards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment and despair are commonplace.”).

. Such correction may occur through formal intervention of the courts or through voluntary redress in response to a prisoner's invocation of the judicial process. Cf. Medberry v. Butler, 185 F.3d 1189 (11th Cir.1999) (prisoner subject to physical assaults transferred shortly after complaint was filed).

. For example, prisoners who have been threatened or attacked are often subject to administrative solitary confinement or hospitalization, respectively. Moreover, our recent decisions in Booth v. Churner, 206 F.3d 289, 291 (3d Cir.2000) and Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir.2000) require the exhaustion of internal prison remedies as a prerequisite for filing an action under § 1983 or Bivens.

. It should be noted that Choyce took a noticeably different approach from Banos v. O’Guin, 144 F.3d 883 (5th Cir.1998), the earlier Fifth Circuit case relied upon by the majority.

. "It is a well established rule that needless constitutional adjudication is to be avoided, and, toward that end, that when 'a construction of the statute is fairly possible by which the [constitutional] question may be avoided,’ such construction should be given” Roe v. Casey. 623 F.2d 829 (3d Cir.1980) (Hunter, J., concurring) (quoting Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (additional citations omitted)).

. The same level of scrutiny also applies to laws that impose burdens based on a "suspect” classification. The majority reasons that neither prisoners nor indigents are suspect classes. It does not necessarily follow that the intersection of these classes — the class of indigent prisoners — is not suspect. After all, possessing neither means nor liberty (and having incurred the disapprobation of society), indigent prisoners are a discrete, insular minority that is perhaps the group least able to protect its fundamental rights through majoritarian processes. Cf. United States v. Carolene Products Co., 304 U.S. 144, 152-53 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) ("whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry”) (citations omitted).

.Chapter 29 of the Magna Carta provided: "To none will we sell, to none will we deny or delay, right or justice.” Magna Carta, c. 29 [c. 40 of King John’s Charter of 1215; c. 29 of King Edward’s Charter of 1297] (1225), quoted in Burkett v. Cunningham, 826 F.2d 1208, 1219 (3d Cir.1987). The effect of this guaranty was explained by Sir Edward Coke as follows:
[E]very subject ... for injury done to him ..., by any other subject, be he ... free, or bond, ... or be he outlawed, ... or any other without exception, may take his remedy by the course of the law, and have justice, and right for the injury done to him, freely without sale, fully without any denial, and speedily without delay.
*326 Coke, The Second Part of the Institutes of the Laws of England 55 (Brooke, 5th ed. 1797), quoted in Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).

.See, e.g., Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (holding that state courts may not deny appellate review to criminal defendants due to their inability to pay transcript fees); Burns v. Ohio, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209 (1959) (requiring states to waive filing fees for indigent prisoners in criminal cases); Boddie v. Connecticut, 401 U.S. 371, 380, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (extending Griffin to civil divorce context, reasoning that "a cost requirement, valid on its face, may offend due process because it operates to foreclose a particular party’s opportunity to be heard.”); Johnson v. Avery, 393 U.S. 483, 485-86, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), (striking down ban on prisoners assisting other inmates with habeas corpus petitions, explaining that "it is fundamental that access of prisoners to the Courts for the purpose of presenting their complaints may not be denied or obstructed”, and observing that "a State may not validly make the writ available only to prisoners who could pay a $4 filing fee.”); Wolff, supra (applying holding and rationale oí Avery to civil rights actions).

. See Lewis v. Casey, 518 U.S. 343, 354, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (stating that Wolff "extended the right of access to the courts” to " 'civil rights actions’ — i.e., actions under 42 U.S.C. § 1983 to vindicate ‘basic constitutional rights.' ”).

. Cf. Lewis, 518 U.S. at 350, 116 S.Ct. 2174 (describing the "right of access to the courts” as "already well-established” when Bounds was decided).

. Only twice in our history has the Supreme Court approved exaction of fees which had the effect of excluding an indigent would-be party from court. Both cases involved gratuitous government benefits, rather than underlying constitutional rights. See United States v. Kras, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973) (bankruptcy); Ortwein v. Schwab, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973) (welfare).

. See also Adams v. Carlson, 488 F.2d 619, 630 (7th Cir.1973) ("[A]n inmate’s right to ... access to the courts is as fundamental a right as any other he may hold.... All other rights are illusory without it.”); Lewis, 518 U.S. at 405 n. 1, 116 S.Ct. 2174 (Stevens, J., dissenting) ("Without the ability to access the courts and draw their attention to constitutionally improper behavior, ... prisoners ... would be deprived of the first — and often the only— 'line of defense’ against constitutional violations.”).

. See Joshua D. Franklin, Three Strikes and You're Out of Constitutional Rights? The Prison Litigation Reform Act’s “Three Strikes" Provision and its Effect on Indigents, 71 U. Colo. L.Rev. 191, 194 (“When an indigent prisoner with three' strikes seeks to litigate a matter affecting a fundamental interest, any legislation that substantially burdens the right of access to the courts must be subject to strict scrutiny review, rather than the more deferential rational relation standard of review.”).

. The majority asserts that Appellant waived his argument that the right to be free from serious physical injury is as fundamental as the right to divorce (as to which a right of access to court was recognized in Boddie)', but surely an assessment of the importance of the infringed interest is implicitly part of every due process or equal protection challenge. In any event, so long as we are addressing the level of scrutiny to apply, we cannot avoid deciding whether a fundamental right is burdened.
The majority responds that "the importance of the underlying right is largely immaterial to the question whether that right is a fundamental interest for Boddie purposes”, because "an underlying constitutional entitlement rises to the level of a Boddie fundamental interest only when the government blocks the sole legal means for safeguarding that entitlement. ...” Supra at 316 n. 2. I believe this response conflates the elements of fundamental right and burden: the importance of the right at stake is precisely what determines whether it Is "fundamental”; while the availability of other means to safeguard the right may help to determine the extent to which the right is burdened, it has no bearing on whether the burdened right is fundamental.

. This right is embodied in the Eighth Amendment prohibition against cruel and unusual punishments.

. See Wolff, 418 U.S. at 556, 94 S.Ct. 2963 ("Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race.”).

. Although the majority marshalls to its support cases from five other circuits which have applied a rational basis review to section 1915(g), four of these cases were explicitly premised on the absence of an underlying fundamental interest. See Carson v. Johnson, 112 F.3d 818, 821 (5th Cir.1997) (holding prisoner had no fundamental interest in subject of suit); Rivera v. Allin, 144 F.3d 719, 724 (11th Cir.1998) ("Rivera’s well-pled allegations ... plainly advance no cognizable fundamental interest.”); Rodriguez v. Cook, 169 F.3d 1176, 1180 (9th Cir.1999) (agreeing with Carson and Rivera that “where a fundamental interest is not at stake, section 1915(g) does not infringe upon an inmate’s meaningful access to the courts”); White v. Colorado, 157 F.3d 1226, 1233-34 (10th Cir.1998) (recognizing right of action extends to suits seeking to vindicate basic constitutional rights, but con *328 cluding that prisoner failed to state a claim for violation of the Eighth Amendment). The fifth case, Wilson v. Yaklich, 148 F.3d 596 (6th Cir.1998), acknowledged that the constitutional right of access to the courts “is indeed 'fundamental ” and that a prisoner’s access must be "adequate, effective and meaningful”, but found that the right was not infringed solely because the prisoner still had recourse to state court. Id. at 605 (citations omitted).

.See also Stacey H. O’Bryan, Note, Closing the Courthouse Door: The Impact of the Prison Litigation Reform Act’s Physical Injury Requirement on the Constitutional Rights of Prisoners, 83 Va. L.Rev. 1189, 1202-10 (1997) (mentioning the right to be free from racial segregation, the right to privacy, and the right to be free from non-physical violations of the Eighth Amendment as among those left unprotected as to prisoners barred from litigation by section 1915(g)).

. Cf. n. 19, supra (discussing Magna Carta’s prohibition against sale, delay or denial of justice).

. According to the majority, Congress "[r]ec-ogniz[ed] that it could take prisoners a significant period of time to obtain the filing fee in some cases”. Supra at 315.

. See also Banos, 144 F.3d at 885 n. 1 ("It is possible that a potential litigant who is denied IFP status under this provision will not have the ability to pay the entire filing fee within the statute of limitations or, in the case of an appeal, within the time for filing an appeal, and will thereby be precluded from litigating or appealing his case on the merits.”).

. As the majority correctly observes, the Court’s ruling in Boddie turned on the State’s monopoly over divorce actions and the resultant absence of any “recognized, effective alternatives” for resolution. Boddie, 401 U.S. at 375-76, 91 S.Ct. 780. The case does not, however, stand for the proposition that availability of a state forum justifies selective denial of access to a federal forum for the vindication of federal civil rights claims.

. If, as appears to be the case, the statute’s constitutionality as applied to suits based on fundamental rights hinges on the availability of an adequate state forum, we should make this limitation explicit in order to guide the District Courts.

. The argument that federal courts may turn a deaf ear to those who have access to state courts "disregards the historic importance of access to federal courts to pursue civil rights claims under 42 U.S.C. § 1983.” Lukens, The Prison Litigation Reform Act, 70 Temp. L.Rev. at 512. Cf. Monroe v. Pape, 365 U.S. 167, 174, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (one purpose of § 1983 "was to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice”); McCarthy, 503 U.S. at 153, 112 S.Ct. 1081 ("federal courts must take cognizance of the valid constitutional claims of prison inmates”) (citations omitted).
It is important to note that the Supreme Court has expressly rejected the converse argument that the availability of a federal remedy justified a filing fee that effectively barred indigent prisoners from state court. See Smith v. Bennett, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961). To paraphrase the Court's admonition, "it would ill-behoove this great [nation], whose devotion to the equality of rights is indelibly stamped upon its history, to say to its indigent prisoners seeking to redress what they believe to be [violations of federal law]: 'go to the [state] court.’ ” Id. at 713, 81 S.Ct. 895.

.See, e.g., 41 Pa.C.S.A. § 6602(f) (West Supp.1999); La.Rev.Stat. Ann. § 1187 (West Supp.1999). See also Laurie Smith Camp, Why Nebraska Needs Prison Litigation Reform, 76 Neb. L.Rev. 781, 781 (1997) (proposing parallel state legislation in Nebraska); Three Strikes, 71 U. Colo. L.Rev. at 209-210 (predicting that "[o]ther states are likely to re *330 spond similarly to the influx of claims brought by [prisoners] who are otherwise precluded from bringing suit in forma pauperis”).

. In its amicus brief, Pennsylvania argues that a state forum is available, but inexplicably neglects to notify us that the purported alternative is generally unavailable to Pennsylvania prisoners with claims concerning prison conditions.

. See The Prison Litigation Reform Act, 70 Temp. L.Rev. at 513-517 (observing that if defendant removes the case to federal court as permitted under 28 U.S.C. § 1441, plaintiff may lose his right to appeal the federal claims if he is within the provisions of section 1915(g) and cannot afford prepayment in full; he may also be unable to appeal pendent state claims over which the district court exercised jurisdiction).

. See Griffin, 351 U.S. at 18, 76 S.Ct. 585 ("It is true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all. But that is not to say that a State that does grant appellate review can do so in a way that discriminates against some convicted defendants on account of their poverty.”); See also Three Strikes, 71 U. Colo. L.Rev. at 209 (noting that "[although the right to an appeal is not constitutionally guaranteed, equal protection concerns nevertheless arise when this right is effectively denied to only one class of litigant”) (citing Douglas v. California, 372 U.S. 353, 357-58, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963)).

.Cf. Frank I. Michelman, The Supreme Court and Litigation Access Fees: The Right to Protect One’s Rights — Part II, 1974 Duke L.J. 527, 559 (observing that a fixed fee’s deterrent effect on frivolous filings will vary inversely with the individual’s finances, with the truly indigent being "totally ‘deterred’ ”). Mi-chelman concludes that " ‘Deterrence’ in any acceptable sense of that term, can be depended upon to operate only on that group of citizens to whom [the fee] will seem neither a prohibitive sum, nor, on the other hand, a *331 trifling amount to pay for the privilege of demanding one’s rights.” Id.

. In the present case, according to the District Court, only one of Appellant's disqualifying dismissals occurred after the effective date of the PLRA. App. 20.

. See 28 U.S.C. § 1915(b)(4) (Supp. Ill 1997) (providing that ”[i]n no event shall a prisoner be prohibited from bringing a civil action or appealing a civil or criminal judgment for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee.”). This saving provision is inapplicable to prisoners subject to section 1915(g).

. The majority's discussion does not say how the three strikes rule is supposed to further deterrence. Instead, it seems to say that the three strikes rule is rationally related to its goal because it is within congressional power. See supra at 319 ("Preventing frequent filers from obtaining fee waivers is rationally related to the legitimate government interest of deterring frivolous lawsuits because ‘Congress is no more compelled to guarantee free access to federal courts than it is to provide unlimited access to them.’ ”). This is patently a non sequitur.

. See, e.g., Mary Tushnet and Larry Yackle, Symbolic Statutes and Real Laws: The Pathologies of the Antiterrorism and Effective Death Penalty Act and the Prison Litigation Reform Act, 47 Duke L.J. 1 (Oct. 1997) ("[N]otably, the statute allows any prisoner who can pay the complete filing fee in advance to file as many frivolous or malicious lawsuits as she wants.”).

. Compare Watson, 901 F.2d 329, 331 (finding denial of constitutional right where blanket bar to IFP filings failed to "consider[ ] the effects on a legitimate claim”).

. Illustrating the "general inappropriateness of withdrawing the in forma pauperis privilege as a means to curtail ... abuse”, the Green court observed:
On the one hand, Green is totally free to flood the courts with paper provided that he pays the going rate: orders erecting financial barriers are only as effective as the litigant is truly impoverished. On the other hand, these restrictions are clumsily over inclusive: if Green does not have the money to file a frivolous claim, he also does not have the money to file a legitimate one.
669 F.2d 779.

. The injunction that apparently remains in effect against Appellant, setting special filing preconditions in response to his history of abuse, is but one example. See supra at 311. Another example is the PLRA’s own provision for judicial screening. Under section 1915A, a court may review and assess the merit of a prisoner's claims before docketing. See 28 U.S.C. § 1915A(a)-(b) (Supp. Ill 1997). These measures, directed at particular abusers and particular frivolous claims, are clearly more narrowly tailored to serve their proper end than the three strikes classification, which lumps good faith err or with abuse and stifles meritorious claims along with frivolous ones. See Lukens, The Prisoner Litigation Reform Act, 70 Temp. L.Rev. at 505-06 (observing that "Section 1915(g) ... treats the prisoner who has filed otherwise meritorious claims, but failed to name the proper party, ... in the same manner as the litigant who sued the President ... for stealing the multiplication tables from him.’’)

. The District Court in Lyon noted that, unlike the traditional discretionary power of the courts to limit abusive litigation by an individual prisoner based on his particular circumstances, the "three dismissal rule” gave no consideration to, e.g., length of incarceration, number of meritorious actions, or "other pertinent information that might guide a federal court in properly limiting abuse....” Lyon, 940 F.Supp. at 1438. Applying a strict scrutiny review, the District Court held section 1915(g) violative of equal protection. The Eighth Circuit undertook no constitutional review, finding instead that the plaintiff lacked standing because he had sufficient funds.

. The majority’s response that constitutional constraints require "neither a perfect nor even best available fit” between statutory ends and means, supra at 318-19, quoting Mariani v. United States, 212 F.3d 761, 774 (3d Cir.2000) (en banc), is not entirely apt. Section 1915(g) is not constitutionally deficient because it is merely imperfect or suboptimal; rather, its very high degree of both under- and over-inclusiveness renders it an extremely poor fit. Cases such as Mariani, which permit a certain degree of under-inclusiveness in statutes that burden First Amendment rights, therefore do not advance the inquiry. In the context of an equal protection challenge to a burden on access to the courts, the Supreme Court has found the same type of under- and over-inclusiveness at issue here to be constitutionally impermissible. See supra at 331-32.

. This conclusion is in accord with an apparent consensus among commentators who have addressed the constitutionality of the PLRA’s three strikes provision. See, e.g., Luk-ens, The Prison Litigation Reform Act, supra n. 36; Franklin, Three Strikes, supra n. 25; David C. Leven, Justice for the Forgotten and Despised, 16 Touro L.Rev. 1, 15 (Fall 1999); Mary Tushnet and Larry Yackle, Symbolic Statutes and Real Laws: The Pathologies of the Antiterrorism and Effective Death Penalty Act and the Prison Litigation Reform Act, 47 Duke L.J. 1, 70 (Oct. 1997); Simone Schonenberger, Access Denied: The Prison Litigation Reform Act, 86 Ky. L.J. 457 (1997-1998); Catherine G. Patsos, The Constitutionality and Implications of the Prison Litigation Reform Act, 42 N.Y.L. Sch. L.Rev. 205 (1998).

. In addition to its infirmity on equal protection grounds, section 1915(g) raises troubling questions concerning the constitutional prohibition against bills of attainder and ex post facto laws, in'that it operates as an extrajudicial punishment against an identified group based on their past conduct. As noted by the majority, the three strikes rule seeks to deter prisoner litigation by "disqualifying frequent filers who have failed in the past to carefully evaluate their claims prior to filing.” Supra at 318. Cf. Hughes Aircraft Co. v. United States, 520 U.S. 939, 947, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (stating that a statute which "attaches a new disability, in respect to transactions ... already past, must be deemed retrospective”) (quoting Soc. for Propagation of the Gospel v. Wheeler, 22 F. Cas. 756, 767 (No. 13,156) (C.C.D.N.H.1814) (Story, J.)).
The Supreme Court has identified three requirements for finding that a challenged statute is a bill of attainder: "specification of the affected persons, punishment, and lack of a judicial trial.” Selective Service System v. Minnesota Public Interest Research Group, 468 U.S. 841, 847, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984). As to the first element, section 1915(g) plainly is directed toward "specifically designated persons or groups”. Id., quoting United States v. Brown, 381 U.S. 437, 447, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). The affected prisoners are identified by an objectively ascertainable, immutable characteristic — three or more prior "strikes” — and are commonly referred to in cases and congressional debate by a common pejorative title ("frequent filers”). As to the second element, the majority, appears to acknowledge a punitive purpose and effect: "Potentially negative consequences in federal courts ... are precisely the consequences intended by Congress. The outcome predicted by Appellant [i.e., that a prisoner "could forever lose his ability to bring his suit as a practical matter”] is ... exactly what Congress intended.” Supra at 314-15. Cf. Green, 669 F.2d at 786 (characterizing as "simply punitive” a prepayment requirement which "is not geared to discerning whether each claim presents a new nonfrivolous issue” and which seeks to "deter” by "as-sum[ing]” that the affected prisoner "will not be able to meet the required filing fee”). Finally, as to the third element, section 1915(g) imposes its deprivation without any judicial trial. Cf. Lyon, 940 F.Supp. at 1438 (contrasting blanket bar of section 1915(g) with particularized discretion attendant on judicial proceeding to limit abusive litigation).